**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ENERGY ENVIRONMENTAL CORPORATION,
a Colorado corporation,

      Plaintiff,

v.

THE CITY AND COUNTY OF DENVER, ACTING BY AND THROUGH ITS BOARD OF
WATER COMMISSIONERS A/K/A DENVER WATER,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiff Energy Environmental Corporation for its Complaint against Defendant The City and County of Denver, acting by and through its Board of Water Commissioners also known as Denver Water, states and alleges:

## I.  THE PARTIES

      1.     Energy Environmental Corporation ("EEC") is a Colorado corporation having a principal place of business at 8295 South Krameria Way, Centennial, Colorado 80112.

      2.     The City and County of Denver created the Denver Water Department to operate and maintain a municipal water works system and plant on behalf of the City and County of Denver and its inhabitants and created the Board of Water Commissioners as the governing body and policy maker of the Denver Water Department ("Denver Water"). The City and County of Denver acts by and through its Board of Water Commissioners. Denver Water, which is a municipal corporation and political subdivision of the State of Colorado, exists and operates pursuant to the

1

laws of Colorado and Article 10 of Charter of the City and County of Denver. Denver Water is headquartered in Denver, Colorado.

## II.  JURISDICTION AND VENUE

3.      This action arises under the Patent Act, 35 U.S.C. §§ 101, *et seq.*  The infringing acts of Denver Water, as complained of herein, were committed in this District and have caused and continue to cause EEC injury in this district.  The Court has original jurisdiction over the parties and the claims asserted in this action pursuant to 28 U.S.C. §§ 1331 and 1338.

4.      This Court has personal jurisdiction over Denver Water because Denver Water has committed, and continues to commit, acts of infringement in this District, has conducted business in this District, and/or has engaged in continuous and systematic activities in this District.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1400 because Denver Water has a regular and established place of business in this District and has committed acts of infringement in this District.

## III.   THE PATENTS-IN-SUIT

6.      U.S. Patent 9,410,752 ("the '752 Patent") titled "Hydronic Building Systems Control" was filed on August 16, 2013 and claims priority to Provisional Application No. 61/684,564, filed on August 17, 2012.  The United States Patent and Trademark Office ("USPTO") duly and legally issued the '752 Patent on August 9, 2016.  A copy of the '752 Patent is attached hereto as Exhibit 1 and incorporated herein by reference.

7.      Independent claim 1 of the '752 Patent is representative of the subject matter of the '752 Patent and is set forth in its entirety below.

        1.      A method for controlling heating and cooling in a conditioned space,
        the method comprising the steps of:

(a) receiving in a microprocessor controller a desired set point temperature and a desired set point humidity;

(b) receiving in the microprocessor controller a plurality of sensor inputs from a plurality of sensors, wherein the plurality of sensors sense at least one temperature and at least one relative humidity;

(c) processing by the microprocessor controller the plurality of sensor inputs from the plurality of sensors in light of the desired set point temperature and the desired set point relative humidity;

(d) calculating and tracking by the microprocessor controller a first dew point in a fresh intake air moving into a dehumidifying device; and a second dew point in a thermally conductive structure in the conditioned space;

(e) sending a plurality of digital signals from the microprocessor controller to a devices controller; and

(f) sending a plurality of control signals from the devices controller to a plurality of devices, the plurality of devices selected from the group consisting of analog devices and digital devices, wherein the plurality of devices upon receiving the plurality of control signals achieve the desired set point temperature and the desired set point humidity in the conditioned space by:

(i) circulating a fluid within at least one of the thermally conductive structure and the dehumidifying device, wherein the dehumidifying device is in fluid connection with the thermally conductive structure;

(ii) moving the fresh intake air through the dehumidifying device and into the conditioned space;

(iii) keeping a first temperature of the fluid less than the first dew point at the dehumidifying device; and

(iv) keeping a second temperature of the fluid greater than the second dew point at the thermally conductive structure.

8.      U.S. Patent 10,072,863 ("the '863 Patent") titled "Hydronic Building Systems Control" was filed on July 5, 2016 and claims priority to U.S. Continuation Application No. 13/969,316, filed on August 16, 2013 (the '752 Patent), and to Provisional Application No. 61/684,564, filed on August 17, 2012.  The USPTO duly and legally issued the '863 Patent on September 11, 2018.  A copy of the '863 Patent is attached hereto as Exhibit 2 and incorporated herein by reference.

9.      Independent claim 1 of the '863 Patent is representative of the subject matter of the '863 Patent and is set forth in its entirety below.

3

1.      A method for controlling heating and cooling in a conditioned space, the method comprising the steps of:

(a) receiving in a microprocessor controller a desired set point temperature;

(b) receiving in the microprocessor controller a plurality of sensor inputs from a plurality of sensors, wherein the plurality of sensors sense at least one temperature and at least one relative humidity;

(c) processing by the microprocessor controller the plurality of sensor inputs from the plurality of sensors in light of the desired set point temperature;

(d) calculating and tracking by the microprocessor controller a dew point in at least one of:

(i) a fresh intake air moving into a dehumidifying device;

(ii) a thermally conductive structure in the conditioned space; or

(iii) the conditioned space;

(e) sending a plurality of digital signals from the microprocessor controller to a device controller; and

(f) sending a plurality of control signals from the device controller to a plurality of devices, wherein the plurality of devices upon receiving the plurality of control signals achieve the desired set point temperature in the conditioned space by:

(i) circulating a fluid within the thermally conductive structure;

(ii) keeping the temperature of the fluid greater than the dew point at the thermally conductive structure.

10.     U.S. Patent 10,330,336 ("the '336 Patent") titled "Hydronic Building Systems Control" was filed on August 9, 2018 and claims priority to U.S. Continuation Application No. 15/202,370 (the '863 Patent), to U.S. Continuation Application No. 13/969,316, filed on August 16, 2013 (the '752 Patent), and to Provisional Application No. 61/684,564, filed on August 17, 2012.  The USPTO duly and legally issued the '336 Patent on June 25, 2019.  A copy of the '336 Patent is attached hereto as Exhibit 3 and incorporated herein by reference.

11.     Independent claim 52 of the '336 Patent is representative of the subject matter of the '336 Patent and is set forth in its entirety below.

52. A method for controlling occupant comfort in a conditioned space, the method comprising the steps of:

(a) receiving in a microprocessor controller at least one of a desired set point temperature, a desired set point relative humidity, or a desired set point dew point;

(b) receiving in the microprocessor controller a plurality of sensor inputs from a plurality of sensors, wherein the plurality of sensors sense at least one temperature;

(c) processing by the microprocessor controller the plurality of sensor inputs from the plurality of sensors in light of the desired set point temperature, desired set point relative humidity, or desired set point dew point;

(d) calculating and tracking by the microprocessor controller a dew point in at least one of:

   (i) a fresh intake air moving into a dehumidifying device;

   (ii) a thermally conductive structure in the conditioned space; or

   (iii) the conditioned space;

(e) sending a plurality of digital signals from the microprocessor controller to a device controller; and

(f) sending a plurality of control signals from the device controller to a plurality of devices, wherein the plurality of devices upon receiving the plurality of control signals achieve the desired set point temperature, set point relative humidity, or set point dew point; in the conditioned space by:

   (i) circulating a fluid within the thermally conductive structure;

   (ii) keeping the temperature of the fluid greater than the dew point at the thermally conductive structure,

wherein the microprocessor controller is programmed to provide staged heating, cooling and ventilation.

12. U.S. Patent 10,907,848 ("the '848 Patent") titled "Hydronic Building Systems Control" was filed on May 14, 2019 and claims priority to U.S. Continuation Application No. 16/059,342 (the '336 Patent), to U.S. Continuation Application No. 15/202,370 (the '863 Patent), to U.S. Continuation Application No. 13/969,316 (the '752 Patent), and to Provisional Application No. 61/684,564, filed on August 17, 2012. The USPTO duly and legally issued the '848 Patent on February 2, 2021. A copy of the '848 Patent is attached hereto as Exhibit 4 and incorporated herein by reference.

13. Independent claim 1 of the '848 Patent is representative of the subject matter of the '848 Patent and is set forth in its entirety below.

  1. An apparatus comprising:
  a conditioned space;

a thermally conductive structure oriented below and thermally connected with the conditioned space;

at least one source process heat exchanger fluidly connected to at least one first thermal storage and at least one second thermal storage;

at least one first process heat circulator fluidly connected to the at least one source process heat exchanger and configured to circulate a first source fluid through the at least one first thermal storage;

at least one second process heat circulator fluidly connected to the at least one source process heat exchanger and configured to circulate a second source fluid through the at least one second thermal storage;

at least one hydronic-to-air circulator fluidly connected to the at least one first thermal storage;

at least one energy transfer and ventilation device comprising a dedicated outdoor air system (DOAS) and at least one hydronic coil-to-air heat exchanger, wherein the at least one hydronic coil-to-air heat exchanger is fluidly connected to the at least one hydronic-to-air circulator;

the at least one hydronic-to-air circulator is configured to circulate at least one hydronic coil supply fluid in the at least one hydronic coil-to-air heat exchanger;

the at least one energy transfer and ventilation device is configured with at least one fresh air fan fluidly connected to a fresh air supply;

wherein the at least one energy transfer and ventilation device receives the fresh air supply, and outputs into the conditioned space at least one of:

a fresh air; and
a conditioned air;

at least one fan coil unit comprising: a fan and at least one fan coil unit hydronic coil-to-air heat exchanger in fluid communication with an air in the conditioned space, wherein the at least one fan coil unit returns the air from the conditioned space and supplies the conditioned air into the conditioned space;

a radiant mixing device in fluid communication with the at least one first thermal storage, the thermally conductive structure, and the at least one fan coil unit hydronic coil-to-air heat exchanger;

at least one first hydronic load circulator fluidly connected to the at least one first thermal storage and fluidly connected to the radiant mixing device, wherein the at least one first hydronic load circulator circulates a first hydronic supply fluid to the at least one first thermal storage and the radiant mixing device;

the at least one first hydronic load circulator is fluidly connected to:

the thermally conductive structure; and
the at least one fan coil unit hydronic coil-to-air heat exchanger;

the at least one first hydronic load circulator circulates a mixed radiant supply fluid from the radiant mixing device through:

the thermally conductive structure; and
the at least one fan coil unit hydronic coil-to-air heat exchanger;

wherein a temperature of the mixed radiant supply fluid is modulated by the operation of at least one of:

the radiant mixing device; and

the at least one first hydronic load circulator that modulates a mixed flow of fluid comprised of a portion of at least one of:

the first hydronic supply fluid; and

a first hydronic return fluid;

at least one second hydronic load circulator fluidly connected to:

the at least one second thermal storage that is fluidly connected to:

the thermally conductive structure that is fluidly connected to:

the at least one fan coil unit hydronic coil-to-air heat exchanger that is fluidly connected to:

at least one DOAS hydronic coil-to-air heat exchanger;

wherein the at least one second hydronic load circulator circulates a second hydronic supply fluid in:

the at least one second thermal storage; and

at least one of:

the thermally conductive structure;

the at least one fan coil unit hydronic coil-to-air heat exchanger; and

the at least one DOAS hydronic coil-to-air heat exchanger;

at least one temperature sensor in at least two of:

the conditioned space;

the thermally conductive structure; and

the at least one energy transfer and ventilation device;

at least one humidity sensor in at least two of:

the conditioned space;

the at least one energy transfer and ventilation device; and

the fresh air supply;

a plurality of sensors that send a plurality of sensor inputs to a microprocessor controller, the plurality of sensors selected from the group consisting of at least two of:

the at least one temperature sensor;

a pressure sensor;

an atmospheric pressure sensor;

the at least one humidity sensor; a relative humidity sensor;

an air velocity sensor;

a fluid velocity sensor;

a power sensor; and

a real time energy use sensor;

a building automation system configured to achieve at least one of:

at least one energy efficiency;

at least one health benefit;

at least one safety benefit; and

at least one comfort benefit;

the building automation system comprising:

a client/server architecture; and

the microprocessor controller;

a memory coupled to and readable by the microprocessor controller and storing therein a plurality of instructions that, when executed by the microprocessor controller, causes the microprocessor controller to:

receive at least one of:

a cooling set point temperature for the conditioned space;

a heating set point temperature for the conditioned space;

a temperature from the at least one temperature sensor; and

a humidity level from the at least one humidity sensor;

calculate a dew point temperature for at least one of:

a fresh air intake;

the conditioned air into the conditioned space;

a surface of the thermally conductive structure; and

the conditioned space;

in response to processing at least one of:

the cooling set point temperature for the conditioned space; and

the heating set point temperature for the conditioned space;

process:

the temperature from the at least one temperature sensor;

the humidity level from the at least one humidity sensor; and

the dew point temperature;

to achieve at least one of:

the at least one energy efficiency;

the at least one health benefit;

the at least one safety benefit; and

the at least one comfort benefit;

execute at least two of the following:

send a thermal storage temperature control signal to the at least one source process heat exchanger causing the at least one source process heat exchanger to maintain at least one of:

a set point  temperature in the at least one first thermal storage; and

a set point temperature in the at least one second thermal storage;

send a hydronic-to-air circulator control signal to the at least one hydronic-to-air circulator causing the at least one hydronic-to-air circulator to circulate the at least one hydronic coil supply fluid;

send a first hydronic load circulator control signal to the at least one first hydronic load circulator causing the at least one first hydronic load circulator to circulate the mixed radiant supply fluid;

send a second hydronic load circulator control signal to the at least one second hydronic load circulator causing the at least one second hydronic load circulator to circulate the second hydronic supply fluid;

send a hydronic supply mixing control signal to at least one of the radiant mixing device and the at least one first hydronic load circulator that modulates at least one of the temperature of the mixed radiant supply fluid and the flow rate of the mixed radiant supply fluid and maintain a temperature of the surface of the thermally conductive structure above the dew point temperature;

send a DOAS temperature control signal to the at least one energy transfer and ventilation device that modulates a temperature of the conditioned air from the at least one energy transfer and ventilation device into the conditioned space;

send a DOAS humidity control signal to the at least one energy transfer and ventilation device that modulates a humidity of the conditioned air from the at least one energy transfer and ventilation device into the conditioned space; and

send a ventilation air fan control signal to at least one of:
the at least one energy transfer and ventilation device; and
the at least one fresh air fan to modulate a fan speed.

14.     The '752 Patent, '863 Patent, '336 Patent and the '848 Patent are collectively referred to as "the EEC Patents."

15.     EEC owns all rights, title and interest in and to the EEC Patents.

## IV.   GENERAL ALLEGATIONS

### A.     EEC

16.     EEC was formed by Albert R. Wallace in 2006 and is a leading designer and installer of high-performance heating, cooling and ventilating systems for commercial and residential spaces.  EEC's systems intelligently control hydronic radiant heating and cooling with dehumidification to achieve high efficiency and cost savings.

17.     Mr. Wallace is a member of the American Society of Heating and Refrigeration and Air Conditioning Engineers (ASHRAE); a Certified Geo-Exchange Designer (CGD) and Certified Energy Manager (CEM) by the Association of Energy Engineers; a Certified Trainer and Installer by the International Ground Source Heat Pump Association; and certified and permitted by the Colorado Division of Water Resources for geo-exchange systems. Mr. Wallace has earned

the LEED for Homes Accredited Professional designation from the U.S. Green Building Council. He is a former Associate Member of the American Institute of Architects, served as past President of the Colorado Heat Pump Association, and as a HERS rater and Director of E*Star Colorado. Mr. Wallace holds Advanced Building Science Master's Certification and is a certified contractor for Tridium's NiagaraAX enterprise control software. He served on the technical committee creating the 2015 Uniform Solar, Hydronics and Geothermal Code from the International Association of Plumbing and Mechanical Officials.

18.     Mr. Wallace holds a Bachelor of Science degree in Aeronautical Engineering from the U.S. Air Force Academy in Colorado Springs, a Master's degree in Business Administration from Golden Gate University in California, and dual Master's degrees in Architecture and Landscape Architecture with Certificates in Design/Build and Historic Preservation from the University of Colorado at Denver.

19.     As part of its business, EEC provides professional engineering consulting in the area of radiant heating and cooling, geothermal heat pumps, building science, ventilation systems and controls.

B.     **EEC's Prior Relationship with M.A. Mortenson Company and Heating & Plumbing Engineers, Inc.**

20.     In 2013, EEC was engaged by and provided consulting engineering services to RMH Group, a mechanical and electrical consultant hired to design a radiant heating and cooling system to be installed as part of new barracks being constructed at Fort Carson in Colorado Springs, Colorado for the 13th Combat Aviation Brigade. The general contractor for the Fort Carson construction project was M.A. Mortenson Company ("Mortenson"). The lead mechanical engineering company for the Fort Carson barracks construction project was Heating & Plumbing

Engineers, Inc. ("HPE"). Upon information and belief, RMH Group engaged EEC as a consultant because Mortenson, the general contractor, expressed concerns regarding the adequacy of RMH Group's radiant heating and cooling system design for the barracks.

21.     In an August 27, 2013 meeting, Mr. Wallace, on behalf of EEC, reported to Mortenson, RMH Group and HPE that the RMH Group design would not meet the specifications of the U.S. Army for the Fort Carson 13th Combat Aviation Brigade barracks and identified needed enhancements for the radiant heating and cooling system design to meet the Army's specifications. At the August 27 meeting, Mr. Wallace disclosed his original pending patent application (Application Serial No. 13/969,316, now the '752 Patent) to Mortenson, HPE and RMH Group, and provided a diagram directly from his pending patent application of a viable radiant heating and cooling system that would satisfy the Army's specifications.

22.     On September 11, 2013, Mr. Wallace met with RMH Group engineers to discuss his concerns specific to the faulty design of the radiant heating and cooling system for the barracks.

23.     On September 13, 2013, Mr. Wallace met with Mr. William Green, a Principal and President of RMH Group, and Mr. Hung Dang, Senior VP of Engineering at RMH Group, in a final attempt to remedy the faults in the RMH design for the barracks.  At that meeting, Mr. Dang explained to Mr. Wallace that the design was 90 percent complete and had already been approved by the U.S. Army Corps of Engineers.  He explained to Mr. Wallace that RMH Group was a long standing business with qualified engineers and advised Mr. Wallace to focus on issues unrelated to the identified potential system failures.  After this meeting and following delivery of EEC's report commenting on the RMH Group design, RMH Group chose not to follow Mr. Wallace's advice and terminated EEC's consulting involvement. The hydronic heating and cooling system

was built according to RMH Group's design and subsequently failed. Litigation ensued between HPE and RMH Group over the failure of RMH Group's design. In connection with the litigation, HPE hired Mr. Wallace as an expert in the area of radiant heating and cooling system design and operation. Upon information and belief, the lawsuit settled favorably to HPE and the radiant heating and cooling system in the Fort Carson barracks was retrofitted to incorporate the changes suggested by Mr. Wallace and as described in his then-pending patent application.

       **C.**     **The Denver Water Administration Building**

     24.     In 2016, construction started on redevelopment of the operational complex for Denver Water, a municipal entity empowered by the City and County of Denver, Colorado to operate and maintain a water works system on behalf of the City and County of Denver. The operational complex included construction of a new Administration building at 1600 West 12th Avenue, Denver, Colorado ("the Administration Building"). Construction of the Administration Building is complete. Mortenson was the general contractor for construction of the Administration Building. HPE was the contractor responsible for all mechanical engineering with respect to the design and construction of the Denver Water Administration Building.

     25.     The Administration Building incorporates a hydronic radiant system together with a ventilation system (collectively, "the Accused System") that is used for heating, cooling and conditioning the air within the building. Upon information and belief, HPE designed and installed the Accused System. Publicly available engineering drawings, labeled Denver Water Operations Complex Redevelopment, 01 Administration, Construction Documents, Volume 2, Food Service/Fire/MEP/Lighting/Technology/Acoustics, and dated March 24, 2017, disclose relevant

details of the Accused System. A copy of these construction drawings is attached hereto as Exhibit 5 and incorporated by reference in its entirety.

26.     At least as early as December 7, 2017, EEC provided written notice to Denver Water of the '752 Patent and EEC's then pending patent application Serial No. 15/202,370 (which issued as the '863 Patent). A copy of the notice is attached as Exhibit 6 and is incorporated herein by reference in its entirety. The notice was sent by certified mail and, upon information and belief, was received by Denver Water. Shortly thereafter, EEC was contacted by William Eustace, President of HPE, who acknowledged having received a copy of the December 7, 2017 notice from Denver Water. Upon information and belief, Mr. Eustace was acting on behalf and at the request of Denver Water. Mr. Eustace expressed to EEC his displeasure with the notice and, upon information and belief, also caused Uponor Corporation, a piping supplier who worked with EEC, to threaten legal action against EEC due to the notice.

27.     By letter dated November 6, 2019 to James Lochhead, Chief Executive Officer of Denver Water, counsel for EEC notified Denver Water that the heating, ventilating and cooling system installed and operating in the Denver Water Administration Building infringed EEC's '752 Patent, '863 Patent and '336 Patent. At this point in time, the '848 Patent had not issued. A copy of this letter is attached as Exhibit 7 and is incorporated herein by reference in its entirety.

28.     Counsel for Denver Water acknowledged receipt of the November 6, 2019 letter by email on November 20, 2019 and stated that the letter had been forwarded to its general contractor, Mortenson, and architect, Stantec Inc.  A copy of this email is attached as Exhibit 8 and is incorporated herein by reference in its entirety.

29.     Subsequently, in late February or early March, 2020, counsel for Mortenson contacted counsel for EEC by telephone and advised that Mortenson had tendered defense of EEC's patent infringement claims to HPE and that Mortenson and its subcontractor would be following up with a response to the infringement claims. A copy of an email confirming the telephone conversation is attached as Exhibit 9 and is incorporated herein by reference in its entirety.

30.     To date, no response has been provided to EEC from Denver Water, Mortenson, HPE or any other Mortenson subcontractor.

### D.     Patent Infringement by Denver Water

31.     Operation of the Accused System directly infringes one or more of the '752 Patent claims without authority of EEC.  More specifically and without limitation, Denver Water has been and is directly infringing, either literally or under the doctrine of equivalents, at least Claims 1-6, 10, 12 and 13 of the '752 Patent by operation of the Accused System.  A claim chart further detailing infringement of these claims of the '752 Patent is attached as Exhibit 10 and incorporated herein by reference in its entirety.

32.     Denver Water directly infringes one or more of the '863 Patent claims without authority of EEC.  More specifically and without limitation, Denver Water has been and is directly infringing, either literally or under the doctrine of equivalents, at least Claims 1-4, 6-8, 17-19 and 36-39 of the '863 Patent by operation of the Accused System.  A claim chart further detailing infringement of these claims of the '863 Patent is attached as Exhibit 11 and incorporated herein by reference in its entirety.

33.     Denver Water directly infringes one or more of the '336 Patent claims without authority of EEC.  More specifically and without limitation, Denver Water has been and is directly infringing, either literally or under the doctrine of equivalents, at least Claims 52-56, 60, 61, 65 and 73-77 of the '336 Patent by operation of the Accused System.  A claim chart further detailing infringement of these claims of the '336 Patent is attached as Exhibit 12 and incorporated herein by reference in its entirety.

34.     Denver Water directly infringes one or more of the '848 Patent claims without authority of EEC.  More specifically and without limitation, Denver Water has been and is directly infringing, either literally or under the doctrine of equivalents, at least Claims 1-80 of the '848 Patent by operation of the Accused System.  A claim chart further detailing infringement of these claims of the '848 Patent is attached as Exhibit 13 and incorporated herein by reference in its entirety.

### V.     FIRST CLAIM FOR RELIEF
**(Patent Infringement Under 35 U.S.C. § 271(a) – U.S. Patent No. 9,410,752)**

35.     The allegations set forth in paragraphs 1 through 34 are hereby realleged and incorporated herein by reference.

36.     With knowledge of the '752 Patent, Denver Water, directly and literally, or in the alternative under the doctrine of equivalents, infringes one or more claims of the '752 Patent, in violation of 35 U.S.C. § 271(a), in this district by operating the Accused System.

37.     The infringement of the '752 Patent by Denver Water has been willful since the Accused System was first operated and continues to be willful.

38.     Because of Denver Water's infringement of the '752 Patent, EEC has suffered and will continue to suffer damages.

39.     Because of Denver Water's infringement of the '752 Patent, EEC has suffered and will continue to suffer irreparable harm in this District.

## VI.   SECOND CLAIM FOR RELIEF
**(Patent Infringement Under 35 U.S.C. § 271(a) – U.S. Patent No. 10,072,863)**

40.     The allegations set forth in paragraphs 1 through 34 are hereby realleged and incorporated herein by reference.

41.     With knowledge of the '863 Patent, Denver Water, directly and literally, or in the alternative under the doctrine of equivalents, infringes one or more claims of the '863 Patent, in violation of 35 U.S.C. § 271(a), in this district by operating the Accused System.

42.     The infringement of the '863 Patent by Denver Water has been willful at least since Denver Water received the November 6, 2019 letter (Exhibit 7) and continues to be willful.

43.     Because of Denver Water's infringement of the '863 Patent, EEC has suffered and will continue to suffer damages.

44.     Because of Denver Water's infringement of the '863 Patent, EEC has suffered and will continue to suffer irreparable harm in this District.

## VII.  THIRD CLAIM FOR RELIEF
**(Patent Infringement Under 35 U.S.C. § 271(a) – U.S. Patent No. 10,330,336)**

45.     The allegations set forth in paragraphs 1 through 34 are hereby realleged and incorporated herein by reference.

46.     With knowledge of the '336 Patent, Denver Water, directly and literally, or in the alternative under the doctrine of equivalents, infringes one or more claims of the '336 Patent, in violation of 35 U.S.C. § 271(a), in this district by operating the Accused System.

47. The infringement of the '336 Patent by Denver Water has been willful at least since Denver Water received the November 6, 2019 letter (Exhibit 7) and continues to be willful.

48. Because of Denver Water's infringement of the '336 Patent, EEC has suffered and will continue to suffer damages.

49. Because of Denver Water's infringement of the '336 Patent, EEC has suffered and will continue to suffer irreparable harm in this District.

### VIII. FOURTH CLAIM FOR RELIEF
### (Patent infringement Under 35 U.S.C. § 271(a) – U.S. Patent No. 10,907,848)

50. The allegations set forth in paragraphs 1 through 34 are hereby realleged and incorporated herein by reference.

51. Denver Water, directly and literally, or in the alternative under the doctrine of equivalents, infringes one or more claims of the '848 Patent, in violation of 35 U.S.C. § 271(a), in this district by operating the Accused System.

52. Because of Denver Water's infringement of the '848 Patent, EEC has suffered and will continue to suffer damages.

53. Because of Denver Water's infringement of the '848 Patent, EEC has suffered and will continue to suffer irreparable harm in this District.

54. Denver Water's continued infringement of the '848 Patent by operation of the Accused System is willful.

### IX. PRAYER FOR RELIEF

WHEREFORE, EEC prays for judgment in its favor and against Denver Water as follows:

a. That Denver Water has infringed one or more claims of the EEC Patents;

b.      That Denver Water, its officers, directors, agents, servants, employees, privies, representatives, attorneys, parent and subsidiary corporations or other related entities, successors, assigns, licensees, retail distributors, and all persons in active concert or participation with any of them, be enjoined from infringing the EEC Patents or, in the alternative, be compelled to enter into a patent license with EEC authorizing the continued operation of the Accused Systems relative to the EEC Patents;

c.      That EEC be awarded damages in an amount to be determined at trial for Denver Water's infringing activities, which are no less than a reasonable royalty;

d.      That EEC be awarded treble damages by reason of any willful, wanton and deliberate infringement found under 35 U.S.C. § 284;

e.      That EEC be awarded its pre-judgment and post-judgment interest;

f.      That EEC be awarded its costs and expenses of suit, including expert witness fees;

g.      That EEC be awarded its attorneys' fees should this case be found to be exceptional under 35 U.S.C. § 285;

h.      That Denver Water be required to account for all gains, profits, advantages, and unjust enrichment derived from its violations of law; and

j.      That EEC be awarded other and further relief as the Court deems appropriate and just.

## X.   <u>JURY DEMAND</u>

EEC demands a trial by jury on all issues so triable.

DATED:  August 17, 2021                    Respectfully submitted,


By:  s/ Todd P. Blakely
      Todd P. Blakely
         tblakely@sheridanross.com
      Paul Sung Cha
         pscha@sheridanross.com
      SHERIDAN ROSS P.C.
      1560 Broadway, Suite 1200
      Denver, Colorado 80202-5141
      Telephone:    303-863-9700
      Facsimile:    303-863-0223
      E-mail:        litigation@sheridanross.com

      ATTORNEYS FOR PLAINTIFF
      ENERGY ENVIRONMENTAL
      CORPORATION